UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


ELZA VEE WILLIAMS,            )
                             )
            Plaintiff,        )
                             )
        v.                   )        No. 4:08 CV 764 DDN
                             )
                             )
 MICHAEL J. ASTRUE,           )
Commissioner of Social Security, )
                             )
            Defendant.        )


**MEMORANDUM**

   This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Elza Vee Williams for Disability Insurance Benefits and Supplemental Security Income under Title II and Title XVI of the Social Security Act, 42 U.S.C. § 401, et seq.  The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge under 28 U.S.C. § 636(c).  (Doc. 7.)  For the reasons set forth below, the ALJ's decision is affirmed.


**I.  BACKGROUND**

   Plaintiff Elza Vee Williams was born on March 29, 1956.  (Tr. 59.) She is 5'6" tall with a weight that has ranged from 190 pounds to 213 pounds.  (Tr. 33, 116.)  She is divorced, with four adult children, and one grandchild.  (Tr. 88, 242.)  She completed the eleventh grade, and later went to school to become a certified nurse's aid (CNA).  (Tr. 33.) She last worked in a factory in 2005.[1]  (Tr. 55.)

   On November 17, 2005, Williams applied for Disability Insurance Benefits and Supplemental Security Income, alleging she became disabled on December 30, 2003, on account of osteoarthritis and obesity.  (Tr. 59-60, 96-102.)  She received a notice of disapproved claims on February

_____

   [1]In a work history report, Williams stated she worked as a CNA in June 2005.  (Tr. 118.)  Yet, at the hearing, she testified that she worked in a factory for three months in 2005.  (Tr. 55.)

15, 2006.  (Tr. 61-66.)  After a hearing on March 7, 2007, the ALJ denied benefits on July 16, 2007.  (Tr. 15-26, 29-58.)  On March 25, 2008, the Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 2-5.)

## II.  MEDICAL HISTORY

On an unknown date, Williams completed a disability report. Rheumatoid arthritis, high blood pressure, asthma, sinus problems, sleeping disorders, depression, and impairments in her right side, back, and left arm prevented her from working.  These impairments made it impossible to bend, or lift anything heavy.  The impairments first started bothering Williams in March 2000, and she became unable to work on December 30, 2003.  She ultimately quit working on June 30, 2005, because she was unable to do any heavy lifting.  She had to take a lot of time off while she worked because of her impairments.  At the time of the report, Williams was taking Accupril and Norvasc for high blood pressure, Hydrochlorothiazide (HCTZ), Lipitor for cholesterol, Naproxen and Tramadol for pain relief, Trazadone for insomnia, and Zoloft for depression, and using an Albuterol inhaler for her asthma.[2]  (Tr. 116-26.)

On an unknown date, Williams completed a disability report appeal. Her medication list was unchanged since her last report, and Williams noted no changes in her condition.  (Tr. 146-52.)

On April 5, 2003, Williams went to the emergency room, complaining of a rash and "low blood."  She had weakness and pain in her left arm, and had been complaining of general weakness for the past month or two. A physical exam showed her eyes were pallor and that she had a rash. Her neurological and musculoskeletal areas were normal.  She was alert and oriented, with speech and behavior appropriate to her age.  She was diagnosed with anemia, prescribed Benadryl and Ferrous Sulfate, and told

---

[2]Hydrochlorothiazide is used to treat high blood pressure.  WebMD, http://www.webmd.com/drugs (last visited August 26, 2009).

to follow-up with her primary doctor and dermatologist.[3]  She was sent home that day.  (Tr. 198-205.)

On September 2, 2003, Williams went to the doctor, complaining of left shoulder swelling and pain that would come and go.  She had injured her rotator cuff while lifting a patient.  Vioxx relieved the pain, but made her drowsy.[4]  She was wearing a sling.  She was doing her exercises, but they hurt.  She had not yet participated in physical therapy.  Williams was discharged that day.  Scott Soerries, M.D., indicated Williams "should be able to return to work tomorrow," but that she should "continue limited duty as before."  Dr. Soerries diagnosed Williams with a left rotator cuff strain, and prescribed Celebrex.[5]  (Tr. 182-85.)

On October 25, 2003, Williams went to the doctor, complaining of an intermittent fever and chills for the past four days, a sore throat, and swelling and pain in her right lower extremity.  She reported being unable to eat.  She was diagnosed with a sore throat and degenerative arthritis, and prescribed Naproxen and Penicillin.[6]  (Tr. 177-81.)

---

[3]Anemia is the condition where the number of blood cells, the amount of hemoglobin within the blood, and the volume of packed red blood cells within the blood are less than normal.  Anemia is often characterized by pale skin, shortness of breath, heart palpitations, lethargy, and fatigue.  Stedman's Medical Dictionary, 72 (25th ed., Williams & Wilkins 1990).
Benadryl is an antihistamine used to relieve symptoms of allergy, hay fever, and the common cold.  It is also used to prevent and treat nausea, vomiting, and dizziness caused by motion sickness.  Ferrous Sulfate (FeSO4) is an iron supplement, used to treat low iron levels in the blood.  WebMD, http://www.webmd.com/drugs (last visited August 26, 2009).

[4]Vioxx was used to treat arthritis pain, but is no longer prescribed.  WebMD, http://www.webmd.com/drugs (last visited August 26, 2009).

[5]Celebrex is an anti-inflammatory drug used to treat arthritis.  WebMD, http://www.webmd.com/drugs (last visited August 26, 2009).

[6]Penicillin is an antibiotic used to treat and prevent a wide variety of bacterial infections.  WebMD, http://www.webmd.com/drugs (last visited August 26, 2009).

On October 25, 2003, Dr. Jonathan Hayes reviewed an x-ray of Williams's right knee. The x-ray showed no evidence of any fractures or dislocations, but showed spurring of the tibial plateau, distal femur, and patella, along with mild narrowing of the joint spaces.[7] The soft tissues were unremarkable. Dr. Hayes diagnosed Williams with osteoarthritis of the right knee. (Tr. 188.)

On November 11, 2003, Williams went to the emergency room, complaining of a sore throat, nausea, vomiting, and runny eyes. The medical notes indicated she was ambulatory, alert, oriented, and her speech and behavior was appropriate. At the time of treatment, Williams was taking Albuteral, Norvasc, Amitriptyline, and HCTZ.[8] A physical assessment revealed her head, neck, chest, lungs, abdomen, back, and pelvis were all within normal limits. Williams was found to be improved, and was discharged home. On discharge, the doctor prescribed her Humibid, Biaxin, and an Albuterol inhaler, and instructed her to take her medication as directed.[9] (Tr. 192-96.)

On October 13, 2004, Williams went to the emergency room, complaining of vaginal bleeding. Medical notes showed Williams was oriented and obeyed commands. During a review of her symptoms, Williams denied any skin rash or weight loss or gain. She had a history of high blood pressure, but denied any recent exertional chest pain or palpitations. She had a known history of depression, which was under treatment. She denied any joint pain or swelling, and there was no prior history of gout or rheumatoid arthritis. A physical examination showed Williams was pleasant, slightly obese, and in no acute distress. Her heart was normal and her lungs were clear. Her abdomen was soft and slightly obese, but there was no localized palpable tenderness or

---

[7]A spur, or calcar, is a small projection from a bone. Stedman's Medical Dictionary, 227.

[8]Amitriptyline is used to treat depression. WebMD, http://www.webmd.com/drugs (last visited August 26, 2009).

[9]Humibid is used to relieve coughs caused by the common cold, bronchitis, and other breathing illnesses. Biaxin, or Clarithromycin, is used to treat a wide variety of bacterial infections. WebMD, http://www.webmd.com/drugs (last visited August 26, 2009).

masses.  There was no evidence of peripheral edema or calf tenderness in the lower extremities.[10]  A neurological examination showed Williams had good motor strength in all her extremities, and that her gait was normal.  Her cranial nerves were intact.  She was diagnosed with anemia and abnormal uterine bleeding, prescribed Ferrous Gluconate and Docusate Sodium, and told to continue Provera.[11]  (Tr. 164-74.)

On June 24, 2005, Williams went to the emergency room, complaining of high blood pressure, chest pain, and headaches.  She rated the chest pain as 7/10.  A neurological examination showed Williams was alert with behavior appropriate to the situation.  (Tr. 220-24.)  That same day, Daniel Sexton, M.D., reviewed an x-ray of Williams's chest.  The x-ray showed the lung fields were well expanded and clear of any active disease.  The heart and mediastinum appeared normal, and the bony architecture was intact.[12]  It was a normal chest x-ray.  (Tr. 228.)  An x-ray of the brain also came back normal.  (Tr. 229-30.)

On August 25, 2005, Williams went to the emergency room, complaining of migraines and stomach pains for the last twelve hours.  A physical examination showed Williams was normal in all areas.  Her lungs and breathing were also normal.  She was discharged home, ambulatory, and in stable condition.  The doctor prescribed Norvasc. (Tr. 208-14, 217.)

On August 26, 2005, Dr. Bhargavi K. Patel reviewed a CT scan of the brain, after Williams had been complaining of headaches with severe hypertension.  The CT scan revealed the central ventricles appeared normal, with no mass effect or midline shift visible.  There was no

---

[10]Edema is an accumulation of watery fluid in cells, tissues, or cavities.  Stedman's Medical Dictionary, 489.

[11]Ferrous Gluconate an iron supplement used to treat or prevent low blood levels of iron.  Docusate Sodium, or Colace, is used to treat occasional constipation.  Provera is used to treat abnormal bleeding from the uterus.  WebMD, http://www.webmd.com/drugs (last visited August 26, 2009).

[12]The mediastinum is the anatomic region located between the lungs that contains all the principal tissues and organs of the chest except the lungs.  Encyclopedia Britannica, http://www.britannica.com/ EBchecked/topic/372181/mediastinum (last visited August 26, 2009).

evidence of intracranial hemorrhage or major vessel ischemia.[13]  Dr. Patel found the CT scan normal.  (Tr. 215-16.)

On November 22, 2005, Williams completed a function report.  In a typical day, she took her medication, went back to sleep, and woke up around 1:00 p.m.  She spent the rest of the day sitting around the house, watching television.  She took care of one of her sons, cooking his food and washing his clothes.  Williams did not note any problems with personal care.  She prepared her own meals, twice a day, and it took no time.  She cleaned the house on her own, though it took a while for her to do it.  She could go out alone, and typically went out three times a week, driving to stores.  Her hobbies included watching television.  She used to crochet, but could no longer do so, because of her hands.  Her impairments also affected her ability to lift, bend, walk, climb stairs, use her hands, and get along with others.  She could only walk two blocks before needing to rest.  In the personal remarks section, Williams noted injuring her arms on the job in 2003.  She had cared for a bipolar son from the time he was 5 until he was 13 years old.  She noted always wanting to work, and having worked most of her life.  She was very depressed, prone to crying spells, and unable to sleep at night.  She kept to herself so people would not see her depressed.  (Tr. 127-34.)

On November 22, 2005, Williams completed a work history report. In 1993, she worked cleaning an office.  In 1994 and 1995, she worked as a hotel maid.  In 1999, 2000, and March and June 2005, she worked as a CNA for a nursing home.  As part of the job, she worked forty hours a week, taking care of patients.  She put the patients in bed, bathed them, fed them, shaved them, and gave them their medications.  She walked and stood about seven hours a day, and had to lift the patients several times a day, frequently lifting over 150 pounds. (Tr. 118, 135-42.)

On January 24, 2006, Saul Silvermintz, M.D., examined Williams. At the time of the visit, her chief complaints were rheumatoid

_____

[13]Ischemia is local anemia due to mechanical obstruction (mainly arterial narrowing) of the blood supply.  Stedman's Medical Dictionary, 803.

arthritis, high blood pressure, asthma, sinus trouble, pain in the right side, pain in the back, difficulty sleeping, and depression.  A patient had fallen on Williams when she was working as a CNA, and since then, she had experienced pain going from her shoulder down to her knees, along with pain in her back.  She noted having trouble walking, using her arms, and grabbing things.  Her back pain was constant, her right leg had given way, and she had fallen a few times as well.  Her fingers looked as if she suffered from arthritis, with swelling and painful joints.  Despite medication, her blood pressure was not under control.  She suffered asthma attacks about three times a week, which lasted about five to ten minutes.  (Tr. 233-34.)

A physical examination showed Williams was well-developed, obese, but not in any acute distress or discomfort.  Dr. Silvermintz found her "slightly belligerent[:] 'I don't feel good.'"  Her nose and throat were unremarkable.  Her lungs were clear, without rales, rhonchi, or wheezes, and her heart rate and rhythm were regular.  Her back showed some localized tenderness over the dorsal spine at L5-S1, with limitation of flexion.[14]  All four extremities showed no evidence of malformation, swelling, or edema.  Williams stated her fingers, knees, and right ankle swelled at times, but Dr. Silvermintz observed "there is no swelling today."  The arthritis in her hand prevented her from making a complete fist with her right hand, and the motion of each shoulder was somewhat limited.  She had skin lesions over her spine and legs.  She walked with a limp, favoring her right lower extremity.  She was unable to walk on the heels or toes of her right foot, but was able to get on and off the examination table without difficulty, and had no problem with fine finger movement.  A neurological exam showed the cranial nerves and deep tendon reflexes were intact.  She had 5/5 grip strength in each hand,

---

[14]The human spinal column consists of thirty-three vertebrae. There are seven cervical vertebrae (denoted C1-C7), twelve thoracic vertebrae (denoted T1-T12), five lumbar vertebrae (denoted L1-L5), five sacral vertebrae (denoted S1-S5 and fused together into one bone, the sacrum), and four coccygeal vertebrae (fused together into one bone, the coccyx).  The cervical vertebrae form part of the neck, while the lumbar vertebrae form part of the lower back.  The sacrum is immediately below the lumbar vertebrae.  Stedman's Medical Dictionary, 226, 831, 1376, 1549, 1710, Plate 2.

and 5/5 strength in both upper extremities.  Dr. Silvermintz diagnosed
Williams with uncontrolled hypertension, obesity, sinusitis, asthma,
degenerative joint disease of the back and joints, and arthritis.  (Tr.
234-36, 239-40.)

On January 24, 2006, Jack Tippett, M.D., reviewed x-rays of
Williams's lumbar spine and right hip.  The spinal x-ray showed
generalized osteopenia throughout, with minimal wedging of L1 and L2,
and anterior bridging at L1-2[15].  There were small osteophytes on all of
the lumbar and lower thoracic vertebral bodies, but the intervertebral
disk spaces were preserved.[16]  The hip x-ray showed no evidence of a
fracture, and the femoral head was properly seated in the acetabulum.
The was a minimal amount of degenerative changes.  (Tr. 237-38.)

On January 24, 2006, L. Lynn Mades, Ph.D., examined Williams.
Williams complained of being stressed, staying to herself, and having
problems sleeping and losing weight.  She had previously received mental
health treatment at Hopewell, and it was unclear why she had stopped
going.  She experienced mood problems about three times a week, but
medication helped with most of the symptoms.  She denied any history of
inpatient psychiatric treatment, but two of her sons had a history of
psychiatric problems.  A mental status examination revealed Williams was
well-groomed, nominally cooperative, and alert.  Her posture and gait
were within normal limits, and there was no unusual motor activity.  She
was coherent, relevant, and logical.  Her speech was normal, and there
were no tangents or flights of ideas.  Her mood was guarded, slightly
depressed, and somewhat hostile.  Her affect was restricted, and
generally appropriate.  She denied any hallucinations, or suicidal or
homicidal ideation.  There was no evidence of thought disturbance.  Her
expressed verbal judgment was poor to fair.  She was currently living
with two of her sons.  She spent most of her time watching television
and sleeping, but had no problems taking care of her personal needs.
During the mental examination, she demonstrated the ability to maintain

---

[15]Osteopenia is a condition where bone density is lower than
normal.  Stedman's Medical Dictionary, 1110.

[16]An osteophyte is a bony outgrowth or protuberance.  Stedman's
Medical Dictionary, 1110.

adequate attention and concentration, with appropriate persistence and pace. Dr. Mades diagnosed Williams with a dysthymic disorder, and assigned her a GAF score of 65 to 70.[17] Dr. Mades also believed Williams might have personality issues and a mild mood impairment, but there was no evidence of any thought disturbance. Her prognosis for Williams was fair. (Tr. 241-45.)

On February 10, 2006, Judith McGee, Ph.D. completed a psychiatric review technique. In her review, she found Williams suffered from affective disorders, namely dysthmia, but that this impairment was not severe. McGee found Williams had mild limitations in maintaining social functioning and maintaining concentration, persistence, and pace, and no limitations in her daily activities. Williams had no episodes of extended decompensation. She also noted that Williams had co-existing, non-mental impairments that warranted referral. In her notes, Dr. McGee noted that Williams's symptoms were fully credible, but that she was not seeing a psychiatrist, and had never been hospitalized. (Tr. 260-74.)

On June 9, 2006, Williams went to the orthopedist, complaining of right shoulder pain, 8/10. Anti-inflammatories provided little relief. X-rays of the shoulder were negative, but Williams was positive for

_____

[17]Dysthymia, sometimes referred to as chronic depression, is a less severe form of depression. With dysthymia, depression symptoms can linger for a long period of time, perhaps two years or longer. People who suffer from dysthymia are usually able to function adequately but might seem consistently unhappy. WebMD, http://www.webmd.com/depression/ guide/chronic-depression-dysthymia (last visited August 26, 2009).

A GAF score, short for Global Assessment of Functioning, helps summarize a patient's overall ability to function. A GAF score has two components. The first component covers symptom severity and the second component covers functioning. A patient's GAF score represents the worst of the two components. On the GAF scale, a score of 65 to 70 represents mild symptoms (such as depressed mood and mild insomnia), or some difficulty in social, occupational, or school functioning (such as occasional truancy, or theft within the household), but the individual generally functions pretty well and has some meaningful interpersonal relationships. Diagnostic and Statistical Manual of Mental Disorders, 32-34 (4th ed., American Psychiatric Association 2000).

impingement test.[18]  She had mild degenerative disk disease in the lumbar spine.  Williams was diagnosed with lower back pain and right shoulder impingement.  She was given range of motion exercises and anti-inflammatories.  She declined an injection.  Williams was to follow-up in three to six months.  (Tr. 288-89.)

On June 9, 2006, Myung Kang, M.D., reviewed an x-ray of Williams's lumbar spine and right shoulder.  The spinal x-ray revealed mild degenerative changes of the lumbar spine and part of the lower thoracic spine as well.  There was a question of subtle wedging at L1 and T12.  Otherwise, the disk spaces were well-maintained, and the disk margins smoothly outlined.  There was a partial calcification, or artherosclerosis, of the lower abdominal aorta.[19]  The shoulder x-ray showed minimal degenerative joint disease, but no evidence of fractures, dislocation, or other significant bony pathology.  (Tr. 293-94.)

On July 18, 2006, Williams went to the dermatologist, complaining of persistent lesions.  She had been given some prescriptions, but could not pay for them.  The doctor prescribed Hydroxyzine and Clobetasol, and directed Williams to fill them at the Grace Hill Clinic.[20]  (Tr. 284.)

On July 29, 2006, Williams went to the emergency room, complaining of abdominal pain.  The pain had started that morning, with a gradual onset.  The pain was non-radiating, and moderate in severity.  Williams had experienced some nausea and vomiting, but she was no longer

---

[18]Impingement syndrome is a common condition affecting the shoulder and is closely related to shoulder bursitis and rotator cuff tendinitis. These conditions may occur alone or in combination.  Common symptoms of impingement include difficulty reaching up behind the back, pain with overhead use of the arm, and weakness of the shoulder muscles.  WebMd, http://www.webmd.com/osteoarthritis/guide/impingement-syndrome (last visited August 26, 2009.)

[19]Atherosclerosis is a disease in which plaque builds up within the arteries, constricting blood flow.  National Heart Lung and Blood Institute, http://www.nhlbi.nih.gov/health/dci/Diseases/Atherosclerosis/ Atherosclerosis_WhatIs.html (last visited August 26, 2009).

[20]Hydroxyzine is used for the short-term treatment of nervousness and tension that may occur with certain mental or mood disorders. Clobetasol is used to treat a variety of skin conditions, such as eczema, dermatitis, allergies, and rashes.  WebMD, http://www.webmd.com/drugs (last visited August 26, 2009).

experiencing any pain an hour after arriving at the emergency room. She
had taken Tylenol at home, and thought the Tylenol might have resolved
her pain. A physical examination showed Williams's breathing sounds
were normal and she was in no respiratory distress. Her abdomen was
non-tender, her back was normal upon inspection, and her lower and upper
extremities were also normal upon inspection. A psychiatric review
showed she was oriented with a normal affect. Her final diagnosis was
abdominal pain of unknown etiology. Williams was discharged home. She
was able to walk without assistance, and left unaccompanied. (Tr. 329-
34.)

On December 16, 2006, Williams saw Arun Venkat, M.D., complaining
of chest pain, mild shortness of breath, and nausea. At the time, she
was taking Accupril, Albuterol, and Norvasc. Her son had become ill
that morning, and after she began worrying about the situation,
Williams's symptoms manifested. A physical examination showed Williams
did not have a fever. Her chest was clear with normal breathing sounds,
no respiratory distress, and no infiltrates. She had no cough or
wheezing, and any nausea or shortness of breath had resolved. A review
of her musculoskeletal systems showed Williams had no neck pain and no
back pain. Her heart rate and rhythm were regular. Her abdomen was
soft and non-tender. The lower extremities had no edema, normal range
of motion, and were normal upon inspection. There was no tenderness in
her back, and it was normal upon inspection. A neurological examination
showed no focal sensory or motor deficits, and a normal gait. Dr.
Venkat diagnosed Williams with chest pain with some atypical features,
and hypertension. (Tr. 303-04, 317-21, 324-27.) During a stress test,
Williams did not complain of chest pains, and Khalid Qayum, M.D., found
no diagnostic abnormalities during the test. As part of the stress
test, Williams exercised for over six minutes, and reached 85% of her
maximum predicted heart rate. An echocardiographic report showed
Williams's aortic valve structure and excursion was normal. She had
mild hypertrophy of the left ventricle, but normal left ventricular

systolic function and no significant pericardial effusion.[21]  Dr. Venkat discharged Williams on December 18, 2006, with a prescription for Accupril, HCTZ, and Aspirin.  Her symptoms were improved.  (Tr. 305-16.)

On October 17, 2007, Williams went to the Hopewell Center.  The medical notes indicated Williams had a depressed mood, crying spells, and a history of sleeping problems.  She had no anger issues, no suicidal thoughts, and no hallucinations.  Her memory was not impaired. She was diagnosed with major depressive disorder without psychotic features, hypertension, and asthma, and assigned a GAF score of 55.[22] (Tr. 82-85.)

On December 17, 2007, Williams went to the Hopewell Center for a psychiatric evaluation.  The intake assessment showed Williams was depressed and upset, with crying spells and trouble sleeping.  Williams had four children, three of whom had mental illnesses.  She had also been in a physically abusive relationship for seventeen years.  Williams was unemployed and had not worked in four years.  She had last worked at a nursing home.  A mental status exam showed Williams was casually dressed, but defensive and impatient in answering questions.  Her mood was sad and her affect flat.  She could be forgetful about recent and remote things.  She was oriented, with good insight and judgment.  The clinician, a social worker, assigned Williams a GAF score of 50.[23]  (Tr. 86-91.)

---

[21]Hypertrophy is the general increase in bulk of a part or organ, not due to tumor formation.  <u>Stedman's Medical Dictionary</u>, 746. Systolic function refers to contraction of the heart, especially of the ventricles.  <u>Id.</u>, 1548.

[22]On the GAF scale, a score of 55 represents moderate symptoms (such as flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (such as few friends, conflicts with peers or co-workers). <u>Diagnostic and Statistical Manual of Mental Disorders</u>, 32-34 (4th ed., American Psychiatric Association 2000).

[23]On the GAF scale, a score of 50 represents serious symptoms (such as thoughts of suicide, severe obsessional rituals, frequent shoplifting), or any serious impairment in social, occupational, or school functioning (such as the inability to make friends or keep a job).  <u>Diagnostic and Statistical Manual of Mental Disorders</u>, 32-34 (4th ed., American Psychiatric Association 2000).

**Testimony at the Hearing**

On March 7, 2007, Williams testified before the ALJ.  She lived in a house with her son and her grandson.  She last worked in October 2003, as a CNA.  Before that, Williams worked in hotels, cleaning the rooms and doing laundry.  She had also worked cleaning offices and doing assembling and packing work in a factory.  (Tr. 29-35.)

Williams believed she could no longer work because of arthritis, asthma, heart problems, back problems, and injuries to her right side and left arm.  The arthritis affected her right arm, right side, left side, back, hands, and legs.  Because of the arthritis, her legs swelled, making it difficult to walk, and her hands cramped, making her fingers hard and painful to bend.  Her leg swelled around the entire leg and ankle whenever Williams walked or stood for an excessive period. Walking about four blocks was enough to trigger the leg swelling, though sometimes her leg would be swollen when she woke up.  After walking the four blocks, Williams propped her leg up on a pillow and laid down for four hours.  Williams took Darvocet and Advil for her leg problems, but disliked the Darvocet because it made her drowsy.[24]  (Tr. 35-38.)

Williams could stand for about ten or fifteen minutes without difficulty.  Her back problems were concentrated in the lower back, and the pain in her back made bending and exercising difficult.  The pain in her right side affected her right arm, mostly in the shoulder, and made reaching and bending difficult.  The right side pain also affected her hip.  Williams had been walking with a cane for about a year.  She had been falling about twice a week until she received her cane.  She first started falling about two years earlier, even though an MRI from 2000 had shown no problems.  (Tr. 38-43.)

Williams suffered from asthma and used both an inhaler and a breathing treatment.  She used the breathing treatment every two days. She had never been to the hospital, either the emergency room or inpatient, for her asthma.  She had gone to the hospital for her heart

---

[24]Darvocet is a drug with a narcotic component and is used to treat mild to moderate pain.  WebMD, http://www.webmd.com/drugs (last visited August 26, 2009).

problems, after experiencing chest pains, nausea, and shortness of breath. The doctor had found her heart to be abnormal, but Williams had not yet been seen for a follow-up appointment. (Tr. 43-48.)

Williams suffered from high blood pressure. Despite taking Norvasc and Accupril, her blood pressure remained high. She also had skin problems, where her skin would break out. She took steroids, anti-itching tablets, and applied Clobetasol ointment.[25] The skin problems covered her leg, backside, sides, arms, and chest. (Tr. 48-50.)

Williams did not drive because she could not afford a car, but believed she would be able to drive a car if she had one. She did not go out and visit with friends or family, but her family members visited her. Williams did not leave her house much, because of the pain, and because she did not usually feel like going anywhere. She did not belong to a church or any social clubs. Williams sometimes had difficulty caring for herself. For instance, if her arm was hurting, she might have trouble combing her hair. But when the pain stopped, she was able to do it. Williams swept the floor sometimes, but her son and grandson usually helped her around the house. She also occasionally cooked, bought groceries, and did laundry, but these tasks took much longer because she had to take frequent breaks. When her hands were swollen, Williams had problems picking up and manipulating small objects. She did not sleep well, and was taking Celexa.[26] (Tr. 50-55.)

When Williams stopped working, she received unemployment benefits for six months. In 2005, she worked about three months at the factory, for forty hours a week, at $6.50 an hour. The job involved standing on the assembly line, packing different products. At the hotel, Williams cleaned the rooms, which did not require any heavy lifting, though it did require bending. She attended physical therapy for her right arm

---

[25]Clobetasol is a very strong corticosteroid used to treat a variety of skin conditions, such as eczema, dermatitis, allergies, and rashes. WebMD, http://www.webmd.com/drugs (last visited August 26, 2009).

[26]Celexa is used to treat depression. WebMD, http://www.webmd.com/drugs (last visited August 26, 2009).

and right side in 2000 and 2003.  Williams cooked and washed things for
her grandson.  (Tr. 55-59.)

### III.  DECISION OF THE ALJ

The ALJ found Williams suffered from osteoarthritis, hypertension,
and asthma, but that these impairments did not meet any of the listing
requirements.  The ALJ also noted that Williams alleged suffering from
a sleep disorder and depression.  The ALJ summarized the relevant
medical history.  In doing so, he noted that none of Williams's treating
physicians ever found or imposed any long-term, significant, and adverse
mental or physical limitations on her functional capacity.  The medical
evidence showed that Williams never required surgery or extended
hospitalization, and never experienced significant loss of muscle tone.
The medical evidence also showed that no doctor had found Williams
needed a cane or other assistive device for walking, and that Williams
had not regularly participated in physical therapy or a pain clinic.
The ALJ found the absence of this type of medical evidence inconsistent
with allegations of disabling pain.  (Tr. 18-23.)

The ALJ noted that Williams was not always compliant with her
medication.  In addition, none of her doctors ever recommended that she
stop working.  There was no evidence that Williams's work suffered or
deteriorated because of her impairments.  Williams testified that she
was able to walk up hills to get to the bus stop, cook, clean dishes,
grocery shop, and wash clothes.  In 2005, she reported receiving
unemployment benefits after leaving her job as a factory worker.  The
ALJ found this testimony inconsistent with Williams's allegations of
disability.  Taken together, the ALJ found Williams's description of her
symptoms and limitations not credible, and concluded that she retained
the residual functional capacity (RFC) to lift ten pounds frequently and
twenty pounds  occasionally, and to stand, walk, and sit for six hours
in an eight-hour day.  The ALJ found Williams could not perform her past
relevant work, but that she was capable of performing the full range of
light work.  As a result, Williams was able to perform a significant
number of jobs in the national economy.  Williams's non-exertional

limitations did not change this conclusion.  Accordingly, the ALJ found Williams was not disabled within the meaning of the Social Security Act. (Tr. 23-26.)


## IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and is supported by substantial evidence in the record as a whole.  Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  Id.  In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision.  Id.  As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently.  See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months.  42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942.  A five-step regulatory framework is used to determine whether an individual qualifies for disability.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942.

Steps one through three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment.  Pate-Fires, 564 F.3d at 942.  If the claimant does not suffer from a listed impairment or its equivalent, the

Commissioner's analysis proceeds to steps four and five.  <u>Id.</u>  Step four requires the Commissioner to consider whether the claimant retains the RFC to perform past relevant work.  <u>Id.</u>  The claimant bears the burden of demonstrating she is no longer able to return to her past relevant work.  <u>Id.</u>  If the Commissioner determines the claimant cannot return to past relevant work, the burden shifts to the Commissioner at step five to show the claimant retains the RFC to perform other work.  <u>Id.</u>

In this case, the Commissioner determined that Williams could not perform her past work, but that she maintained the RFC to perform the full range of light work.

## V.  DISCUSSION

Williams argues the ALJ's decision is not supported by substantial evidence.  First, she argues that the ALJ failed to properly consider her RFC.  In particular, she argues the ALJ failed to consider her obesity, degenerative disk disease, and mental disorders.  Second, she argues the ALJ failed to properly consider her subjective complaints. Third, she argues the ALJ failed to properly consider her non-exertional impairments of obesity, depression, pain, and hypertension, and that the ALJ was required to call a vocational expert.  (Doc. 15.)

**Residual Functional Capacity**

Williams argues that the ALJ failed to properly consider her RFC. In particular she argues the ALJ failed to consider her obesity, degenerative disk disease, and mental disorders.  Finally, Williams argues that recent records from Hopewell Center offer additional support that her mental disorders were not appropriately considered.

The RFC is a function-by-function assessment of an individual's ability to do work-related activities based on all the evidence.  <u>Casey v. Astrue</u>, 503 F.3d 687, 696 (8th Cir. 2007).  The ALJ retains the responsibility of determining a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians, examining physicians, and others, as well as the claimant's own descriptions of his limitations.  <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217-18 (8th Cir. 2001).  Before determining a claimant's RFC, the

ALJ must evaluate the claimant's credibility.  Id.  Ultimately, the RFC is a medical question, which must be supported by medical evidence contained in the record.  Casey, 503 F.3d at 697; Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).

In this case, the ALJ found Williams's allegations not credible, and concluded she retained the physical ability to perform the full range of light work.  In particular, the ALJ concluded Williams retained the RFC to lift ten pounds frequently and twenty pounds occasionally, and to stand, walk, and sit for six hours in an eight-hour workday.  Substantial medical evidence supports these findings.

In April 2003, Williams's neurological and musculoskeletal areas were normal.  In September 2003, Dr. Soerries cleared Williams to return to work.  He also noted that Williams had not participated in physical therapy.  In October 2003, an x-ray revealed osteoarthritis of the right knee.  In October 2004, Williams denied any joint pain or swelling, and there was no evidence of peripheral edema in the lower extremities.  In June 2005, x-rays of the chest and brain came back normal.  In August 2005, Williams was ambulatory, in stable condition, and normal in all areas.  In November 2005, she noted cooking and doing laundry for one of her sons.  She also prepared her own meals, cleaned the house, and reported no problems with her personal care.

In January 2006, Dr. Silvermintz found some tenderness in the dorsal spine, but noted all four extremities showed no evidence of malformation, and that she had full strength in her hands and upper extremities.  That same month, Dr. Mades found Williams had a normal gait, was coherent, had no problems taking care of herself, and that she had the ability to maintain adequate attention and concentration.  She assigned her a GAF score indicating only mild symptoms.  In February 2006, Dr. McGee found Williams suffered from dysthmia, but that the impairment was not severe, and that she only had mild limitations in maintaining social functioning, concentration, persistence, and pace.  In June 2006, x-rays of the shoulder were negative, and x-rays of her spine showed mild degenerative disk disease, with the disk spaces well maintained.  In July 2006, Williams had normal breathing sounds, was in no respiratory distress, and her upper and lower extremities were

normal. She was able to walk without assistance. In December 2006, Williams had no back pain or back tenderness, and her back was normal on inspection. She had normal range of motion, normal gait, and the lower extremities were normal. During a stress test, she did not mention chest pain. In March 2007, Williams stated she could drive a car, cook, buy groceries, and do laundry. She also reported working for three months in 2005.

In all, Williams was able to care for herself and her son without any problems. She even worked for a few months after her alleged onset date. X-rays of her chest, shoulder, and spine showed either mild problems, or none at all. Several doctors found she had a normal gait, normal back, and normal extremities. Dr. Mades and Dr. McGee noted only mild limitations and symptoms with respect to her mental capacity. Dr. Soerries told Williams she could return to work, and no doctor ever placed significant restrictions on her ability to work, or recommended aggressive treatment. See Hensley v. Barnhart, 352 F.3d 353, 357 (8th Cir. 2003) ("[N]o functional restrictions were placed on [claimant's] activities, a fact that we have previously noted is inconsistent with a claim of disability."); Craig v. Chater, 943 F.Supp. 1184, 1189 (W.D. Mo. 1996) ("Allegations of a disabling impairment may be properly discounted because of inconsistencies such as minimal or conservative medical treatment."). Looking to the record, substantial evidence supports the ALJ's RFC determination.

Next, Williams argues the ALJ failed to consider her severe impairments of obesity, degenerative disk disease, and mental disorders. In the opinion, the ALJ found that substantial evidence did not "establish the existence of any other persistent, significant, and adverse limitation of function due to any other ailment." (Tr. 24.) In making this determination, the ALJ discussed the mental-health reports from Dr. Mades and Dr. McGee, the obesity diagnosis from Dr. Silvermintz, and the x-rays showing mild degenerative disk disease. Yet, as noted above, the record reveals that Williams had only mild mental health symptoms. During one recent examination, she had no back pain or tenderness, x-rays revealed the disk spaces were well-maintained, and an inspection showed her back was normal. Only one

doctor diagnosed Williams as obese, while several other reports found Williams had a normal gait and normal extremities.  During the hearing, Williams herself did not list her obesity as a reason she could no longer work.   Looking  to  the  record,  the  ALJ  properly  evaluated Williams's impairments in his RFC analysis.  See Brihn v. Astrue, No. 08-3833, 2009 WL 1668612, at *3 (7th Cir. June 16, 2009) ("An ALJ has no  obligation  to  discuss  residual  functional  capacity  in  light  of impairments that are not medically established.").

Finally, Williams argues that recent records from Hopewell Center offer   additional   support   that   her   mental   disorders   were   not appropriately considered.  The records from October and December 2007 post-date the ALJ's opinion, and assigned Williams GAF scores indicating moderate and serious symptoms.   The Appeals Council looked at the medical evidence from the Hopewell Center, but found the new information did not provide a basis for changing the ALJ's decision.  (Tr. 3.)

After the Appeals Council has considered newly submitted evidence, the reviewing federal court does not evaluate the Appeals Council's decision to deny review.  Riley v. Shalala, 18 F.3d 619, 622 (8th Cir. 1994); Smith v. Astrue, Civil No. 08-5087, 2009 WL 1212480, at *2 (W.D. May 4, 2009).  Instead, the federal court determines whether the ALJ's decision was supported by substantial evidence on the record as a whole. Riley, 18 F.3d at 622.  This review includes consideration of the new evidence, submitted after the ALJ's decision.  Id.; see also Davidson v. Astrue, 501 F.3d 987, 990 (8th Cir. 2007) ("[When] the Appeals Council considers new evidence but denies review, we must determine whether the ALJ's decision was supported by substantial evidence on the record as a whole, including the new evidence.").  As a result, the federal court must, to some extent, engage in the "peculiar task" of speculating as to how the ALJ "would have weighed the newly submitted reports if they had been available for the original hearing."  Riley, 18 F.3d at 622.

After considering the new evidence, substantial evidence still supports the ALJ's decision.  The reports from Dr. Mades and Dr. McGee indicated Williams was coherent, had the ability to maintain adequate attention   and   concentration,   and   had   only   mild   limitations   in

maintaining social functioning, concentration, persistence, and pace. She was assigned a GAF score indicating only mild symptoms, and diagnosed with non-severe dysthmia. The record contained no evidence of any hallucinations, suicidal or homicidal ideation, or hospitalizations for mental health reasons. Finally, there was no discussion of any mental health concerns during the hearing.

The records from Hopewell would not have changed the ALJ's analysis. The records from Hopewell consist of two pages of hand-written notes from a progress note, and an intake assessment completed by a social worker. There is no indication the reports were based on a comprehensive psychological or psychiatric evaluation. Indeed, there is no indication that either of the records from Hopewell was completed by an acceptable medical source, as required by the regulations. See Thibodeaux v. Astrue, 324 F. App'x 440, 445 (5th Cir. 2009) (per curiam) ("Only 'acceptable medical sources' can establish the existence of a medically determinable impairment, give medical opinions, and be considered treating sources whose medical opinions may be entitled to controlling weight."). Under the regulations, a social worker is not considered an "acceptable medical source." See 20 C.F.R. § 404.1513(a). As a result, the undersigned speculates that the ALJ would have given little weight to the records from Hopewell.

Substantial evidence supports the ALJ's RFC determination.

**Subjective Complaints**

Williams argues the ALJ failed to properly consider her subjective complaints.

The ALJ must consider a claimant's subjective complaints. Casey, 503 F.3d at 695 (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). In evaluating subjective complaints, the ALJ must consider the objective medical evidence, as well as the so-called Polaski factors. Guilliams v. Barnhart, 393 F.3d 798, 802 (8th Cir. 2005). These factors include: 1) the claimant's prior work history; 2) the claimant's daily activities; 3) the duration, frequency, and intensity of the claimant's pain; 4) precipitating and aggravating factors; 5) dosage, effectiveness, and side effects of medication; and

6) functional restrictions.  Id.; O'Donnell v. Barnhart, 318 F.3d 811, 816 (8th Cir. 2003).  While these factors must be taken into account, the ALJ does not need to recite and discuss each of the Polaski factors in making a credibility determination.  Casey, 503 F.3d at 695.

The ALJ may discount subjective complaints of pain when the complaints are inconsistent with the evidence as a whole.  Id.  However, the ALJ may not discount a claimant's allegations of disabling pain simply because the objective medical evidence does not fully support those claims.  O'Donnell, 318 F.3d at 816.  When rejecting a claimant's complaints of pain, the ALJ must "detail the reasons for discrediting the testimony and set forth the inconsistencies found." Guilliams, 393 F.3d at 802.  If the ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, the reviewing court "will normally defer to the ALJ's credibility determination." Casey, 503 F.3d at 696.

In this case, the ALJ found Williams not credible.  In reaching that decision, the ALJ noted that Williams had worked for three months in 2005 - more than a year after her alleged onset date.  She reported being able to walk to the bus stop, cook, clean dishes, shop for groceries, wash clothes, and care for one of her sons.  See Johnson v. Apfel, 240 F.3d 1145, 1149 (8th Cir. 2001) ("The fact that [the claimant] was able to carry on a normal life contributes to the finding that his impediments were not disabling.").  None of her doctors ever recommended an assistive device, and Williams had not regularly participated in either physical therapy or a pain clinic.  None of her doctors ever recommended that she stop working.  Under the circumstances, the ALJ followed the Polaski factors, and properly considered Williams's subjective complaints of pain.  The ALJ gave sufficient reasons for his credibility determination.

**Vocational Expert**

Williams argues the ALJ failed to properly consider her non-exertional impairments of obesity, depression, pain, and hypertension, and that the ALJ was required to call a vocational expert.

When the ALJ determines that a claimant cannot perform past relevant work, the burden shifts to the Commissioner to prove there is

work in the national economy that the claimant can perform. <u>Ellis v. Barnhart</u>, 392 F.3d 988, 993 (8th Cir. 2005); 20 C.F.R. § 404.1560(c). If the ALJ finds the claimant has only exertional impairments, the Commissioner may meet this burden by referring to the Medical-Vocational Guidelines. <u>Robinson v. Sullivan</u>, 956 F.2d 836, 841 (8th Cir. 1992). If the ALJ finds the claimant suffers from a non-exertional impairment, the Commissioner may meet this burden by consulting the Guidelines only in certain circumstances. <u>See</u> <u>Thompson v. Astrue</u>, 226 F. App'x 617, 621 (8th Cir. 2007) (per curiam); <u>Sanders v. Sullivan</u>, 983 F.2d 822, 823 (8th Cir. 1992). "An ALJ may use the Guidelines even though there is a nonexertional impairment if the ALJ finds . . . that the nonexertional impairment does not diminish the claimant's residual functional capacity to perform the full range of activities listed in the Guidelines." <u>Thompson</u>, 226 F. App'x at 621. The medical record must support the ALJ's finding. <u>Id.</u>

On the other hand, if the ALJ finds the claimant has non-exertional impairments, and these impairments diminish the claimant's capacity to perform the full range of jobs listed in the Medical-Vocational Guidelines, the Commissioner must solicit testimony from a vocational expert to show the claimant has the capacity to perform work in the national economy. <u>Robinson</u>, 956 F.2d at 841. A non-exertional impairment is any limitation, besides strength, which reduces an individual's ability to work. <u>Sanders</u>, 983 F.2d at 823. Pain and mental impairments are two such limitations. <u>See</u> <u>Beckley v. Apfel</u>, 152 F.3d 1056, 1059 (8th Cir. 1998).

In this case, the ALJ found Williams's subjective complaints were not credible. Instead, the ALJ found that her physical and mental limitations were not disabling, and that she had the RFC to perform the full range of light work under the Guidelines. The ALJ also determined that her non-exertional limitations did not significantly limit her ability to perform the full range of light work. As noted above, substantial medical evidence supports the ALJ's credibility analysis, his RFC determination, and his analysis of Williams's non-severe impairments. The ALJ therefore satisfied the requirements of <u>Thompson</u>,

and did not err in failing to call a vocational expert.  <u>See</u> <u>Thompson</u>,
226 F. App'x at 621.




**VI.  CONCLUSION**

     For the reasons set forth above, the decision of the Commissioner
of Social Security is affirmed.  An appropriate Judgment Order is issued
herewith.




<u>   /S/  David D. Noce        </u>
**UNITED STATES MAGISTRATE JUDGE**

Signed on September 8, 2009.